

U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK

THE DATE OF ENTRY IS

ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 4, 2014**

_____

**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| PRISM GRAPHICS, INC. | § | CASE NO. 08-31914-HDH-7 |
| Debtor. | § | |
| | § | |
| DANIEL J. SHERMAN AS CHAPTER | § | |
| 7 TRUSTEE FOR PRISM GRAPHICS, | § | |
| INC. | § | |
| Plaintiff, | § | |
| | § | ADVERSARY NO. 10-3092-HDH |
| v. | § | |
| | § | |
| BRYAN NETSCH, *et al.*, | § | |
| | § | |
| Defendants, | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE TRUSTEE'S ORIGINAL COMPLAINT TO AVOID AND RECOVER PREFERENTIAL AND FRAUDULENT TRANSFERS, FOR BREACH OF FIDUCIARY DUTY, ALTER EGO AND DENUDING THE CORPORATION

This adversary proceeding requires this Court to look to potential fraudulent transfers,

potential preferential transfers, and other claims arising from the operations of a printing

company prior to its bankruptcy filing.  For the reasons discussed herein, certain transfers by the

Debtor are deemed avoided.

## FACTUAL BACKGROUND

Prism Graphics, Inc. (the "Debtor" or "Prism") was a "print broker," providing print

management services to various customers.  Bryan A. Netsch ("Netsch") was the Chief

Executive Officer and majority shareholder of Prism.  On April 25, 2008, Prism filed for chapter

11 bankruptcy in the Northern District of Texas.  Subsequently, the case was converted to

chapter 7 and Daniel J. Sherman was appointed as Trustee.  This adversary proceeding was

brought by the Trustee against Bryan Netsch, David Bunell, Nicholas Netsch, Marcus Netsch,

Thomas Netsch, Lucas Netsch, Daniel W. Schreimann, P.C., Netsch Limited Partnership, and

Intense Printing, Inc. ("Intense").  Nicholas Netsch, Lucas Netsch, Marcus Netsch, and Thomas

Netsch are the sons of Bryan Netsch and were employees of the Debtor.  David Bunnell was the

president and a minority shareholder of Prism from 2000-2007.  Before this adversary

proceeding commenced, both Bunnell and Daniel W. Schreimann, P.C. settled, and were

dropped as defendants in this proceeding.  At trial, the Trustee abandoned his claim against

Netsch Limited Partnership.  Therefore, the remaining defendants to this adversary proceeding

are Netsch,  Bryan Netsch's sons, and Intense (collectively, the "Defendants").

Prior to January 2008, Prism Graphics marketed and sold its services as part of the

"Prism Group."  The Prism Group was a sales mark used by several companies including the

Debtor and Intense, both Texas Corporations.  All Prism Group companies provided print-related

services.  Netsch was a director and shareholder of both the Debtor and Intense.  In late 2003, the

Debtor entered into an exclusive patent licensing agreement (the "Agreement") with Giddy Up,

LLC ("Giddy Up").  In May 2006, Giddy Up filed a complaint against the Debtor alleging

breach of the Agreement by the Debtor in the United States District Court for the Northern District of Texas. *See Giddy Up, LLC v. Prism Graphics, Inc. and Bryan Netsch*; Civil Action No. 3:06-cv-00948-B ("*Giddy Up*"). The case was tried before a jury from September 17-24, 2007. On September 24, 2007 the *Giddy Up* jury presented a verdict against the Debtor for approximately $850,000 for fraud, violations of the Texas Deceptive Trade Practices Act, and other causes of action. On April 9, 2008, the District Court entered the final judgment against the Debtor for approximately $1,500,000, which includes the damages assessed by the jury plus interest and attorneys' fees. Shortly thereafter, the Debtor filed the instant bankruptcy case.

The evidence presented before this Court made it clear that Bryan Netsch was in control of both Prism and Intense before and at the time of the *Giddy Up* verdict. Before the final memorandum order was handed down in the *Giddy Up* suit, the jury verdict notified Netsch of pending liability to satisfy the judgment. This court heard conflicting testimony from David Bunnell and Bryan Netsch regarding the intent of Netsch to withhold funds from Giddy Up in light of the verdict. Immediately following the verdict, Netsch met with respected bankruptcy counsel even though Prism was still solvent. Bunnell stated that the attorney advised Netsch to let Prism's business fail and to keep the business between Intense and Prism separate. However, according to Bunnell, Netsch wanted to speed up the process. Whether Netsch's intent was to appeal the verdict or whether his intent was to keep assets from Giddy Up, the evidence is clear that immediately preceding and following the verdict, Netsch began the process of shutting down the Debtor and transferring assets from Prism to Intense and himself.

On August 23, 2007, Intense loaned $200,000 to Prism. An August 24, 2007 promissory note from Prism, and signed by Netsch, identified the transfer as a "loan for value received." The parties stipulated that a transfer of the same amount was made by Prism to Intense on

October 17, 2007. On December 31, 2007, Prism transferred $160,000 allegedly in the form of a bonus to Bryan Netsch evidenced by a unanimous consent letter of the directors. The letter was signed by Bryan Netsch and Carol Netsch, his wife. Similar payments, also evidenced by analogous letters of consent, were made in favor of Bryan Netsch in the amount of $80,000 and $11,703.95 on January 23, 2008 and January 30, 2008, respectively. On March 12, 2008, Prism made a $15,000 transfer to Bryan Netsch. In total, Prism transferred at least $466,703.95 to Intense and Bryan Netsch from the time of the *Giddy Up* verdict to the time of the bankruptcy filing.

According to both expert testimony and Netsch, it became clear that at the time of the *Giddy Up* litigation, and for the time following, Prism's most valuable assets were found in its client accounts and operational necessities, such as its employees. On January 1, 2008, the majority of Prism's operations were in a real sense taken over by Intense, as Intense became the party to new contracts with the Debtor's customers. The record shows that when the employees came to work on December 31, 2007 they were employees of Prism, but on and after January 1, 2008, they were considered employees of Intense working on Intense accounts. These employees worked at the same desks and on the same projects as they did for Prism. The transfer of the employees was the result of Bryan Netsch's unilateral action in light of the *Giddy Up* verdict and the soon to follow judgment. Between the verdict and the Debtor's bankruptcy petition, Prism effectively shut down its ordinary operations. On the date of the Bankruptcy Case, the Debtor had about $3,000 in its accounts. So in the course of only a few months, a solvent, operating company lost all its operations and employees and dissipated all its cash, while facing an adverse verdict and judgment.

According to the Defendants, shortly before bankruptcy was filed, the U.S. Marshals entered the Prism premises under court order to enforce the *Giddy Up* judgment by seizing assets from Prism (the "Lockout").  During the Lockout, Prism claims that it and Intense were unable to conduct business, leading to the bankruptcy filing.

Defendants claim that before the marshals arrived on the scene, Debtor had no intention of filing for bankruptcy.  That position is a hard one for this Court to swallow as the credible testimony indicates the Debtor had consulted with a bankruptcy lawyer and also faced a large judgment and had no assets to pay it.

After the Trustee was appointed, the Debtor delivered business records to the Trustee in abysmal shape, making the Trustee's investigation of the business affairs of the Debtor quite difficult.  The Debtor also surprisingly delivered with its records old phone books, junk mail, and other papers with its disorganized business records.

### ANALYSIS

*Fraudulent Transfer Claims*

The Trustee's fraudulent transfer claims are brought under the Texas Uniform Fraudulent Transfer Act contained in the Texas Business and Commerce Code.  The Trustee has the right to bring these state law claims in the bankruptcy case through 11 U.S.C. § 544.

The transfers made from Prism to Intense and Netsch were made in such close proximity to the *Giddy Up* verdict that an inference of fraud arises.  This Court is guided by *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008), in which the Fifth Circuit provides circumstantial indicia as to the validity of a fraud claim, commonly referred to as "badges of fraud."  To determine whether an act rises to the level of fraud, this Court is instructed to look for: (1) a lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3)

the retention of possession, benefit or use of the property in question; (4) the financial condition

of the party sought to be charged both before and after the transaction in question; (5) the

existence or cumulative effect of the pattern or series of transactions or course of conduct after

the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

and (6) the general chronology of events and transactions under inquiry. *Id.*; TEX. BUS. & COM.

CODE § 24.005. It appears that the $160,000 transfer made on December 31, 2007, the $80,000

transfer made on January 23, 2008 to Bryan Netsch (totaling $240,000), and the $200,000

repayment to Intense were fraudulent transfers under this standard. All of these transfers bear

the requisite "badges of fraud" to convince the undersigned that they were made with wrongful

intent.

Some courts have recited the badges of fraud in another way. For instance, a recent

bankruptcy case in this circuit stated that the following were indications or badges of fraud under

§ 24.005, whether:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession
> or control of the property transferred after the transfer; (3) the transfer or
> obligation was concealed; (4) before the transfer was made or obligation was
> incurred, the debtor had been sued or threatened with suit; (5) the transfer was of
> substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor
> removed or concealed assets; (8) the value of the consideration received by the
> debtor was not reasonably equivalent to the value of the asset transferred or the
> amount of the obligation incurred; (9) the debtor was insolvent or became
> insolvent shortly after the transfer was made or the obligation was incurred; (10)
> the transfer occurred shortly before or shortly after a substantial debt was
> incurred; and (11) the debtor transferred the essential assets of the business to a
> lienor who transferred the assets to an insider of the debtor.

*Osherow v. Nelson Hensley & Consol. Fund Mgmt, L.L.C. (In re Pace)*, 456 B.R. 253, 283

(Bankr. W.D. Tex. 2011). In the *Osherow* case, the court determined the transfer of a condo by

the debtor to be a fraudulent transfer, even though it was to a close friend who was not an

insider, because the debtor retained substantial control over the condo after the transfer, as the

6

debtor collected the rent on the condo, was the only person to contact the management company regarding the condo after the transfer, and the debtor's company continued to pay fees for the condo. *Id.* at 267.

There are several badges of fraud in this case that lead the Court to this conclusion, including, payments to insiders, the transfers after the large verdict, the ceasing of operations shortly after the verdict, the consultation with a bankruptcy lawyer, and the pattern of events, including the cessation of business by the Debtor at or near the time of the transfers. The transfers paired with the cessation of business by the Debtor is, in this Court's view, a form of absconding to avoid collection by Giddy Up. And, after the case was filed, the Debtor delivered business records to the Trustee in a disorganized fashion so as to hinder his investigation, a form of hiding.[1]

In August, during the pendency of the *Giddy Up* litigation, but before the verdict, Intense made a loan of $200,000 to the Debtor. This loan was repaid in October, after the *Giddy Up* verdict and after the Debtor met with a bankruptcy lawyer and began the process of ending its ordinary operations.

Under Texas Law, there exists a "good faith" defense to fraudulent transfers, which requires that the transferee take in good faith and for reasonably equivalent value and covers any subsequent transferee or obligee. TEX. BUS. & COM. CODE § 24.009(a). However, courts have found when a judgment debtor systematically disposes of assets surrounding an adverse

---

[1] The Court recognizes that the *Giddy Up* litigation was pending for several years and that a different, longer period might apply for avoiding transfers. Bryan Netsch and others testified that he thought he would win the lawsuit. After the verdict, the situation was clear and any transfers to insiders after that date bear sufficient taint for this Court to find the requisite wrongful intent to avoid as fraudulent transfers the significant transfers to insiders. If a reviewing court finds that the pendency of the lawsuit is enough to infer wrongful intent, the record—and the stipulations of the parties as to the transfers—will make additional transfers avoidable.

judgment, especially to a party in close relation to the defendant, the good faith defense is not available. *See Tow v. Pajooh (In re CRCGP LLC)*, 2008 Bankr. LEXIS 4236 (Bankr. S.D. Tex. Aug. 28, 2008).  In the present case, Bryan Netsch and Intense are essentially one-in-the-same with the Debtor.  If, as in *Tow*, the transfer to a defendant's brother defeats good faith because of the close relation, then it must also be true that transfers from the Debtor to its CEO and transfers from the Debtor to a barely distinguishable sister corporation officing in the same place as the Debtor rise to the same level and cannot be considered transfers in good faith.  In any event, good faith is an available defense for the transferee, but this Court determines that Netsch and Intense did not prove good faith by a preponderance of the evidence.

Therefore, the post-verdict transfers in the amounts of $160,000, $80,000, and $200,000 after the *Giddy Up* verdict are actual fraudulent transfers and must be brought back into the estate.

*Preference Claims*

The Trustee makes allegations of preferential payments to Bryan Netsch and his sons in violation of 11 U.S.C. § 547(b).  That section states the trustee can avoid a transfer of debtor's property:

> (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made—(A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if— (A) the case were a case under chapter 7 of [the Code]; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of [the Code].

11 U.S.C. §547(b).  The burden of proving each element rests in the Trustee.  11 U.S.C. § 547(g).

Netsch is an insider and the preference period for him would be one year. However, the Trustee did not offer evidence of insolvency for transfers made more than 90 days and less than one year before the petition to Netsch. Also, the payments to the sons were outside the 90-day window. Accordingly, only the potential preferences during the 90-day period pre-petition to Bryan Netsch are considered, in accordance with § 547(b)(4)(A). Debtor filed its petition on April 25, 2008, thus, the 90-day preference period began running on January 26, 2008. The only two transfers to Bryan Netsch in this time period were the $11,703.95 transfer on January 30, 2008 and the $15,000 transfer on March 12, 2008.

Both transfers are indisputably made from Prism to Netsch within the 90-day preferential transfer period, thus satisfying elements (1) and (4). A debt is antecedent if it is incurred before the transfer. *Matter of Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996). Both transfers were for debts that were Netsch claims were owed to him for expenses or commissions and element (2) is met.

As to whether the Debtor was insolvent at the time of the two transfers, under § 547(f), the Debtor is presumptively insolvent. Defendants did not offer evidence of solvency in the 90-day period before bankruptcy and, therefore, did not rebut the presumption. Lastly, since Netsch would have been an unsecured creditor with respect to these debts, this is not a 100-cent case, and Netsch received the full amount his claim, Netsch received more than he would have in bankruptcy. Therefore, elements (3) and (5) are also met. The Trustee satisfied its burden of proving preferential transfers in relation to those in the amount of $11,703.95 and $15,000 (dated January 30, 2008 and March 12, 2008, respectively). These transfers shall be avoided.

The Defendants offered some evidence that these transfers were within the ordinary course of business and should not be avoided. This Court rejects that testimony and finds it

unpersuasive. The timing and amount of the transfers and their recipient, Bryan Netsch, all suggest that they were outside the ordinary course, and at the time of transfer, the Debtor was not acting in the ordinary course of its business. Its business operations had shut down. It was not entering into contracts. It had no employees because they had, at Netsch's direction, migrated to Intense at the beginning of the year.

The Trustee also brought claims against Nicholas Netsch, Marcus Netsch, Thomas Netsch, and Lucas Netsch—Bryan Netsch's sons (collectively, the "Netsch sons"). This Court finds that the Netsch sons were part-time employees of Prism in the years preceding the *Giddy Up* litigation. The Trustee asserts that the Netsch sons' respective salaries, both before and after the jury verdict, were disproportionately high compared to the actual value they brought to the company. The Netsch sons' salaries, while perhaps high for their ages and responsibilities, did not significantly change before or during the *Giddy Up* litigation. After the verdict, they left the employ of the Debtor. The Trustee did not meet his burden of proof under either § 547 or Texas law to avoid the transfers to the Netsch sons.

The two payments to Bryan Netsch within the 90 days before the case was filed are also fraudulent transfers under Texas law for the reasons set out earlier in these Findings of Fact and Conclusions of Law, but the Trustee is only entitled to one recovery regarding these payments.

*Other Claims*

The Trustee also made claims of denuding the corporation and breaches of fiduciary duties by the Debtor. The Trustee did not put on sufficient evidence to support either of these claims. Also, well after the trial, on July 25, 2014, the Trustee filed a motion to conform the complaint to the evidence presented at trial to add claims of fraudulent transfers of various intangible assets and unjust enrichment by Intense and Netsch as a result of these transfers. Per

this Court's order on that motion, these claims were not presented at any time before or during trial, and, accordingly, by separate order, were not added by this Court to the complaint.

*Credibility of the Witnesses*

In the event of an appeal from this Court's ruling, the Court makes the following observations on the credibility of several of the witnesses:

1. Daniel J. Sherman, the Trustee, was credible. His testimony regarding the state of the documents delivered to him was important to the Court in its finding that there was an attempt to hide, or at least make difficult, the investigation of these transfers.

2. David Bunnell, a witness for the Trustee, and a former principal of the Debtor, was credible on the points important to this Court's ruling. Mr. Bunnell testified to a dramatic change in the Debtor's operations after the verdict was rendered, which is supported by documents admitted into evidence. He testified that Bryan Netsch stated many times that he did not intend to pay Giddy Up anything. That testimony is supported by the undisputed actions taken by Bryan Netsch after the verdict and by Bryan Netsch's rejection of a relatively small mediation offer to completely end the litigation a few months before trial. Mr. Bunnell's testimony about the Debtor's engagement of a respected bankruptcy lawyer right after the verdict and the parties' conversations with that lawyer is simply more believable. The Defendants attempt to make hay out of the fact that Bunnell settled with the Trustee prior to trial and then changed sides. After the settlement was approved by the Court, Bunnell had no reason to testify one way or another and the Court gives this argument of the Defendants no weight.[2]

---

[2] There was testimony about pending litigation between Bunnell and Bryan Netsch, but this Court does not believe this affects the credibility of this witness.

3. Bryan Netsch's testimony does not square with the facts presented at trial. Contrary to his testimony, the Debtor ceased ordinary business and operations shortly after the verdict. It began to wind down, stopped entering new contracts, and one day after a significant transfer to Bryan Netsch, allowed all of its employees to move over to a sister company, which was servicing the former customers of the Debtor. Despite a large verdict, which was ultimately reduced to an even larger judgment, Bryan Netsch authorized the Debtor to make substantial transfers to himself and others. Mr. Netsch's testimony regarding the reasons for engaging a respected bankruptcy lawyer after the verdict and the conversations with that lawyer was not credible. The condition of the papers delivered to the Trustee suggests an effort to "hide the ball," calling into question the honesty and good faith of the Debtor and Bryan Netsch, and further causes this Court to question the credibility of the story advanced by Bryan Netsch at trial.

## CONCLUSION

For the reasons stated above, the fraudulent transfers of $160,000 and $80,000 to Netsch are hereby avoided and shall be brought back into the estate. Also, the transfers of $11,703.95 and $15,000 to Netsch are deemed preferences under § 547 and are avoided as well. Alternatively, these preferential payments are also fraudulent transfers, but the Trustee is only entitled to a single recovery.

Intense is liable for the $200,000 loan repayment in October.

As this is a fraudulent transfer under Texas law, Defendants are also liable for post-judgment interest and attorneys' fees. Section 24.013 of the Texas Business and Commerce Code allows and equitable and just award of costs and reasonable attorneys' fees. TEX. BUS. & COM. CODE § 24.013. Courts in the Fifth Circuit routinely "award reasonable attorneys' fees to

12

the prevailing party in fraudulent transfer actions under the TUFTA regardless of whether the conduct at issue was egregious." *Osherow v. Nelson Hensley & Consol. Fund Mgmt, L.L.C. (In re Pace)*, 456 B.R. 253, 283 (Bankr. W.D. Tex. 2011) (citing *Tow v. Pajooh (In re CRCGP LLC)*, 2008 Bankr. LEXIS 4236, at \*61-62 (Bankr. S.D. Tex. Aug. 28, 2008) and *Quilling v. 3D Mktg., LLC*, 2007 U.S. Dist. LEXIS 24914, at \*11 (N.D. Tex. Feb. 8, 2007)). The Trustee shall submit a fee application within 14 days of the Findings of Fact and Conclusions of Law; Defendants shall have 14 days to respond; and the Trustee shall have 7 days to reply to that response. After the attorneys' fees are awarded, the Trustee shall submit a judgment comporting with these Findings of Fact and Conclusions of Law.

The Trustee's complaint against the Netsch sons fails. The payment arrangement to them was consistent, though high, until the verdict was rendered. After that, they went off the payroll. As their payments ended with the verdict, there are insufficient badges of fraud regarding their payments to hold them liable under a fraudulent transfer theory and their payments were not proved to be preferences. The payments to them are not avoided.[3]

### ###END OF RULING###

---

[3] Although no party has challenged this Court's constitutional authority to enter a final judgment in this adversary proceeding, the Court will nonetheless independently address its statutory and constitutional authority. This Court has statutory authority to hear this matter because it is a "core proceeding." *See* 11 U.S.C. § 157(b). The parties have also consented. In this circuit, that consent may not count. The consent issue is before the United States Supreme Court now. *See Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013), *cert. granted in part*, 83 U.S.L.W. 3011, 2014 U.S. LEXIS 4693 (U.S. July 1, 2014) (No. 13-935). To the extent that the District Court disagrees with the parties' and this Court's conclusions that this Court has both statutory and constitutional authority to enter a final judgment, these Findings of Fact and Conclusions of Law should be considered proposed findings of fact and conclusions of law to the District Court.